3:26-mj-00071

DISTRICT OF OREGON: ss,                    AFFIDAVIT OF BOBBY GUTIERREZ

**Affidavit in Support of a Criminal Complaint**

I, Bobby Gutierrez, being first duly sworn, hereby depose and state as follows:

**Introduction and Agent Background**

1.      I am a Special Agent with the Federal Bureau of Investigation and have been since January 2021.  I am currently assigned to the FBI's Portland Division and am part of the Transnational Organized Crime and Violent Gang Squad.  I presently work a variety of criminal and national security matters, including the investigation of violent crimes, gangs and narcotics, in addition to the apprehension of federal fugitives.  During my 21-week training at the FBI Academy, Quantico, Virginia, I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.  In my current area of responsibility, I work with law enforcement officers who have experience and training in investigating coded communication involving the distribution of controlled substances and gang affiliations.  I have used this training and experience, as well as the training and experience of other law enforcement officers familiar with this investigation, to demonstrate how criminal enterprises plan, organize and carry out criminal activity.

2.      Prior to being employed with the FBI, I was a Licensed Master Social Worker (LMSW) in the state of Arizona for approximately six years.  As a LMSW, I was responsible for creating and implementing target treatment plans for court-ordered criminal offenders with a chronic history of substance use disorders, domestic violence, and child abuse.  In addition to my employment as an LMSW, I was a behavioral health consultant for Medicare/Medicaid and oversaw medical and mental health treatment for patients residing in assisted living homes and

**Affidavit of Special Agent Bobby Gutierrez**                    **Page 1**

skilled nursing facilities. As a consultant, I was responsible for auditing medical treatment plans, levels of care, and medications to include psychotropic and Schedule II narcotic pain medications.

3.  This affidavit is based upon a joint investigation conducted by the Portland Police Bureau (PPB) Central Neighborhood Response Team (NRT), the Clackamas County Interagency Task Force (CCITF), the United States Attorney's Office (USAO), and the Federal Bureau of Investigation (FBI). Since the beginning of 2024, in response to the influx of fentanyl dealers operating in downtown Portland, Oregon, Investigators, to include these teams and others, have conducted a series of ongoing investigations targeting these fentanyl dealers working primarily in the area of downtown, Portland, Oregon to include neighboring communities. These downtown fentanyl missions have been aimed at reducing the amount of fentanyl in downtown Portland, Oregon. Since these missions started, we have observed a noticeable reduction in the number of fentanyl dealers operating in downtown Portland, as well as reductions in drug overdoses and the criminal activity associated to the sales of narcotics, to include a reduction in gun violence, within the core of the city. This case arose from the most recent mission.

### Purpose of Affidavit

4.  This affidavit is submitted to support a criminal complaint and arrest warrant for **DENIS ALBANI MONTES-BARAHONA**, a Hispanic male, date of birth 02/xx/1988 (hereinafter referenced as "**MONTES-BARAHONA**"), for committing the felony crime of Possession with Intent to Distribute 40 grams or more of Mixture and Substance containing Fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B).

**Affidavit of Special Agent Bobby Gutierrez**                                    **Page 2**

5.      I have obtained the facts set forth in this affidavit through my personal participation in the investigation described below; from reports of other law enforcement officers; and, from records, documents and other evidence obtained during this investigation.

### Confidential Informant

6.      This investigation involves the use of a Confidential Informant (CI) who provided the information by his/her own free will.  CI is working with Investigators and provided actionable information to law enforcement in exchange for consideration on their pending criminal charges.  No promises or guarantees were made by investigators to gain CI's cooperation.  CI has previously been arrested for Domestic Assault/Strangulation, Stalking/Intimidation, Harassing Communications, Possession of a Controlled Substance and Paraphernalia with the intent to use, Possession of Controlled Substances with the Intent to Distribute, and Theft.  CI is specifically aware of the methods of packaging and the prices of the controlled substances because CI has used and/or has had associates who use these and other types of illegal drugs and has accurately described this information to Investigators.  CI has provided information that led to arrests and seizure of contraband.  Based on CI's ability to conduct recorded, drug-related phone calls with a target individual, and observations of physical surveillance that corroborate CI's ability to order narcotics from a target individual, Investigators believe the information CI has provided to be credible and reliable.

### Summary of Probable Cause

*Background on Investigation*

7.      In March of 2026, Investigators met with the CI who provided information on a male fentanyl dealer operating in Portland, Oregon known to the CI by the name "Hamie."  CI was first introduced to "Hamie" in the fall of 2025 by a fentanyl user in downtown Portland.  The CI

**Affidavit of Special Agent Bobby Gutierrez**                                            **Page 3**

learned that "Hamie" was selling powered fentanyl in downtown Portland, Oregon and his fentanyl was described by users as "fire." Based on my training and experience, I know the term "fire" to be used to describe good quality and high potency narcotics. Once introduced, the CI obtained "Hamie's" phone number (385) xxx-9069 (hereinafter as "**Target Cellphone**") to use to order fentanyl. Over the course of time, the CI learned that "Hamie" either conducted fentanyl deals himself or employed a suspected narcotics user to complete the deal on his behalf.

8.    On March 25, 2026, Investigators met with the CI for the purpose of placing an order for narcotics, specifically fentanyl powder, from "Hamie." At the direction of Investigators, the CI reached out to the **Target Cellphone** and communicated with the person they knew as "Hamie," who agreed to sell the CI a predetermined amount of fentanyl powder. After agreeing on the amount and time, "Hamie" and the CI agreed to meet near S.W. 6th Avenue and S.W. Harvey Milk Street, in downtown Portland, Oregon in which to complete the deal.

9.    Once the above narcotics deal was agreed on, Investigators set up near the deal location in an attempt to identity "Hamie." Prior to the deal and at the consent of the CI, Investigators searched the CI for weapons, money, and narcotics. None of the previous items were located. The CI was also given an audio device so that Investigators could listen as the deal took place. The CI was then directed to walk to the location where the deal was to occur.

10.    While Investigators waited for the deal to occur, the CI was approached by two unknown males who had a brief interaction with the CI. Once the CI and the unknown male's broke contact, Investigators began to pick up the audio and heard the CI positively identify "Hamie," to include a description of what "Hamie" was wearing. Shortly thereafter, Investigators observed the CI, Hamie, and an unknown male meet up again near S.W. 5th Avenue and S.W.

Washington St.  It should be noted that Investigators began to have technical difficulties and were no longer able to hear any audio coming from the CI and the suspected dealers.

11.     Investigators continued their surveillance on CI and "Hamie" who were now sitting near the max station for a small period of time and eventually watched as the CI, "Hamie," and the unknown male break away.  Based on the positive identification provided by the CI and the prior agreed deal, Investigators in their marked vehicles using lights and sirens approached and detained "Hamie" and the unknown male subject.  During a search of "Hamie," later identified as **MONTES-BARAHONA**, Investigators discovered multiple small prepackaged Ziplock style baggies containing a white and yellowish powdery substance consistent with the appearance of fentanyl.  A search of the unknown male subject who had been with them revealed a clear bag which also contained small prepackaged Ziplock style baggies containing a white and yellowish powdery substance consistent with the appearance of fentanyl.  Both **MONTES-BARAHONA** and the unknown male subject were subsequently arrested.

12.     While Investigators processed the scene, other Investigators met with the CI who debriefed their interaction with **MONTES-BARAHONA**.  CI advised during their first interaction with **MONTES-BARAHONA**, **MONTES-BARAHONA** attempted to hand the CI the agreed upon fentanyl, but **MONTES-BARAHONA** got spooked after hearing what **MONTES-BARAHONA** believed was the police.  **MONTES-BARAHONA** then directed the CI to meet near "5th and Washington."  When the CI met with **MONTES-BARAHONA** again near the Max (train) stop, **MONTES-BARAHONA** advised the CI to sit down.  While **MONTES-BARAHONA** attempted to serve the CI, **MONTES-BARAHONA** began to get interrupted by other suspected fentanyl customers.  The CI informed Investigators that the other unknown male subject intervened and told **MONTES-BARAHONA** to give him the drugs to serve these

**Affidavit of Special Agent Bobby Gutierrez**                                        **Page 5**

customers while **MONTES-BARAHONA** attended the CI. The CI then observed **MONTES-BARAHONA** hand the other unknown male subject a bag of suspected fentanyl. The unknown male subject then conducted several hand-to-hand deals with these customers. According to the CI, **MONTES-BARAHONA** again attempted to conduct the predetermined deal with the CI. However, **MONTES-BARAHONA** again appeared to get spooked by patrol officers in the area and advised the CI to now go to "4th and Alder" and to not to talk to him if police arrived. Once the CI broke away, the CI observed Investigators make contact with and arrest **MONTES-BARAHONA** and the unknown male subject. Both **MONTES-BARAHONA** and the unknown male subject were each found in possession of bags containing what appeared to be fentanyl.

13.    The suspected narcotics were seized from **MONTES-BARAHONA** and the unknown male subject and taken to PPB's Central Precinct to weigh and field test. Investigators tested samples of the suspected fentanyl powder seized from both individuals, using a MobileDetect test kit, and received a presumptively positive (+) result for fentanyl, a Schedule II controlled substance. I have found MobileDetect to be a reliable way to field test controlled substances with subsequent forensic analysis regularly confirming the initial results.

14.    In summary, Investigators seized approximately 85.6 grams of fentanyl, to include packaging, from the unknown male subject and approximately 111.92 grams of fentanyl, to include packaging, from **MONTES-BARAHONA** for a combined approximate total of 197.52 grams of fentanyl powder, to include packaging. Investigators also seized approximately $237 in U.S. Currency from **MONTES-BARAHONA** believed to be from the sales of narcotics. Below is a photo of the some of the above:

///

///

**Affidavit of Special Agent Bobby Gutierrez**                    **Page 6**





*Fentanyl seized from MONTES-BARAHONA*



*Fentanyl seized from unknown male subject/CD*

15.    While Investigators processed the evidence, Investigators interviewed the unknown

male subject (hereinafter known as "Cooperating Defendant/CD") who agreed to talk to

**Affidavit of Special Agent Bobby Gutierrez**                    **Page 7**

Investigators after being advised of his *Miranda* rights. Below is a summary of what the CD provided:

- CD and **MONTES-BARAHONA** took the Max (train) every day and would arrive in downtown Portland at 9 p.m. to sell fentanyl.

- **MONTES-BARAHONA** employed the CD to screen customers who wanted to buy from **MONTES-BARAHONA**.

- CD would hold the fentanyl for **MONTES-BARAHONA** but would not distribute it.

- For CD's service, **MONTES-BARAHONA** would pay the CD two grams of fentanyl per day.

- CD knew **MONTES-BARAHONA** to be actively selling fentanyl along with his brother Miguel for more than 12 months.

- CD expressed remorse for his actions and advised he assisted **MONTES-BARAHONA** because the fentanyl he got paid was to help with his own withdrawals.

16.     I was then asked to interview **MONTES-BARAHONA** in the Spanish language as I am native Spanish speaker. I then advised **MONTES-BARAHONA** of his constitutional *Miranda* rights in Spanish using FBI form FD-395.15 "Notification De Derechos" in the presence of another Investigator. **MONTES-BARAHONA** acknowledged his *Miranda* rights and agreed to talk to Investigators. Below is a summary of what **MONTES-BARAHONA** provided:

- **MONTES-BARAHONA** advised his name was Vayron Moises Montes-Barahona and was from Ensenada, Mexico.

**Affidavit of Special Agent Bobby Gutierrez**                                              **Page 8**

- **MONTES-BARAHONA** telephone number was (385) xxx-9069 (**Target Cellphone**).

- I advised **MONTES-BARAHONA** the reason for his arrest and my experience investigating fentanyl dealers in downtown Portland and asked why he was in possession of fentanyl.  **MONTES-BARAHONA** advised he was a user.

- I asked **MONTES-BARAHONA** why the fentanyl that was discovered in his possession was prepackaged in small baggies as its packaging was more consistent with distribution and he told me he did not know.

- I asked **MONTES-BARAHONA** where he obtained it from, and he said he got it from someone downtown.  I asked **MONTES-BARAHONA** from who, but he did not know.

17.    I later terminated the interview.  I then called the number for **"Hamie"** and watched the phone that was seized from **MONTES-BARAHONA** began to ring and light up.  The same phone had a screen saver of **MONTES-BARAHONA** on the **Target Cellphone**.  Below are those images:

 

18.     **MONTES-BARAHONA** was subsequently lodged at the Multnomah County Detention Center on federal charges.

19.     I am very familiar with how fentanyl dealers operate, and I know that fentanyl traffickers are increasingly selling both bulk fentanyl powder and counterfeit prescription pills manufactured with fentanyl, a Schedule II controlled substance.  I know that fentanyl powder is typically a white to off-white powder.  Since different weights of powdered fentanyl sell for different amounts, I know that drug dealers selling fentanyl powder will often either prepackage the fentanyl in various predetermined weights for sale or possess a scale to weigh the amount of powder fentanyl they are selling.  I also know drug dealers selling powdered fentanyl, which they will often possess in bulk/larger amounts, will often possess additional packaging materials to repackage the drugs they are selling to their customer.  Depending on their level of addiction, I know that a user of powdered fentanyl will typically buy it in quantities of less than a gram and use it in quantities of much less than 1/10 of a gram.  I know that dealers of powdered fentanyl will often buy fentanyl in larger quantities and then break off and sell it in smaller qualities of a gram or less.  I know that a person possessing more than 10 grams of fentanyl powder does not possess it for personal use but rather such a quantity clearly indicates that it is possessed for purposes of further distribution.

### Conclusion

20.     Based on the foregoing, I have probable cause to believe, and I do believe, that **MONTES-BARAHONA** has committed the felony crime of Possession with Intent to Distribute 40 grams or more of Mixture and Substance containing Fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B).I

**Affidavit of Special Agent Bobby Gutierrez**                                                **Page 10**

therefore request that the Court issue a criminal complaint and arrest warrant for **MONTES-BARAHONA**.

21.     Prior to being submitted to the Court, this affidavit, the accompanying complaint, and the arrest warrant were all reviewed by Assistant United States Attorney Scott Kerin.   AUSA Kerin advised me that in his opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

*By phone pursuant to Fed R. Crim. P. 4.1*
Bobby Gutierrez, Special Agent
Federal Bureau of Investigation

Subscribed and sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at __5:31 pm__ a.m./p.m. on March 26, 2026.


_____
HONORABLE YOULEE YIM YOU
UNITED STATES MAGISTRATE JUDGE

**Affidavit of Special Agent Bobby Gutierrez**                                   **Page 11**